EXECUTION VERSION

## PLAN OF MERGER AND MERGER AGREEMENT

by and among

## FLORIDA FIRST CITY BANKS, INC.,

## FIRST CITY BANK OF FLORIDA

and

## BEACH COMMUNITY BANK

Dated as of January 14, 2020



## TABLE OF CONTENTS

Page

ARTICLE 1 INTERPRETATION.................................................................................................2
    1.1     Definitions .....................................................................................................2
    1.2     Currency.........................................................................................................9
    1.3     Governing Law. .............................................................................................9
    1.4     Schedules and Exhibits .................................................................................9

ARTICLE 2 THE MERGER .....................................................................................................10
    2.1     The Merger ..................................................................................................10
    2.2     Effective Time...............................................................................................10
    2.3     Effect on Capital Stock; Payment ...............................................................10
    2.4     Articles of Incorporation and Bylaws of the Surviving Corporation................10
    2.5     Directors and Officers of the Surviving Corporation....................................10
    2.6     Plan of Merger...............................................................................................10
    2.7     All Liabilities Excluded. ..............................................................................10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................11
    3.1     Corporate Status and Authority; Non-Contravention. .................................11
    3.2     Capitalization of the Bank. ..........................................................................12
    3.3     Business Operations.....................................................................................13
    3.4     Regulatory Reports. .....................................................................................14
    3.5     Unlawful Payments.......................................................................................14
    3.6     Financial Matters. ........................................................................................14
    3.7     Tax Matters...................................................................................................15
    3.8     Litigation......................................................................................................17
    3.9     Employee Matters.........................................................................................17
    3.10    Properties and Leases...................................................................................18
    3.11    Material Changes. ........................................................................................18
    3.12    Material Contracts........................................................................................19
    3.13    Risk Management Instruments ....................................................................19
    3.14    Environmental Matters .................................................................................19
    3.15    Insurance......................................................................................................20
    3.16    Intellectual Property.....................................................................................20
    3.17    Related Party Transactions ..........................................................................20
    3.18    No Additional Agreements ...........................................................................21
    3.19    Anti-money Laundering................................................................................21
    3.20    Mortgage Banking Business. .......................................................................21
    3.21    Nonperforming Assets..................................................................................22
    3.22    Brokers or Finders .......................................................................................22
    3.23    Tax Treatment of the Merger.......................................................................22

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASER..............22
    4.1     Entity Status and Authority; Non-contravention. ........................................22
    4.2     Governmental Authorizations ......................................................................23
    4.3     Capitalization. ..............................................................................................23
    4.4     Litigation and Claims...................................................................................23
    4.5     Regulatory Capitalization. ...........................................................................23

| | | |
|---|---|---|
| 4.6 | Tax Treatment of the Merger. | 23 |
| 4.7 | Stock Offering. | 23 |

ARTICLE 5 PRE-CLOSING MATTERS AND OTHER COVENANTS ...... 23

| | | |
|---|---|---|
| 5.1 | Conduct of Business. | 23 |
| 5.2 | Consents and Approvals. | 24 |
| 5.3 | Notice of Certain Events. | 25 |
| 5.4 | Break Up Fee. | 25 |
| 5.5 | Debtor in Possession. | 26 |
| 5.6 | Bankruptcy Pleadings. | 26 |
| 5.7 | The Bidding Procedures and Sale Order. | 26 |
| 5.8 | Bankruptcy Efforts. | 26 |
| 5.9 | Public Announcements | 26 |
| 5.10 | Tax Elections. | 27 |
| 5.11 | Preparation and Filing of Tax Returns; Taxes. | 27 |
| 5.12 | Tax Cooperation. | 28 |
| 5.13 | Tax Proceedings. | 28 |
| 5.14 | Transfer of Business-Related Assets and Contracts. | 28 |
| 5.15 | Plan. | 28 |
| 5.16 | Appeal. | 29 |
| 5.17 | Non-Solicitation of Competing Bids. | 29 |

ARTICLE 6 CONDITIONS OF CLOSING ...... 29

| | | |
|---|---|---|
| 6.1 | Conditions to Purchaser's Obligations. | 29 |
| 6.2 | Conditions to the Company's Obligations. | 31 |
| 6.3 | Mutual Condition. | 31 |
| 6.4 | Termination. | 31 |
| 6.5 | Investigations. | 33 |

ARTICLE 7 CLOSING TRANSACTIONS ...... 33

| | | |
|---|---|---|
| 7.1 | Time and Place. | 33 |
| 7.2 | Company's Closing Deliverables. | 33 |
| 7.3 | Purchaser's Closing Deliverables. | 34 |
| 7.4 | Bank's Closing Deliverables. | 34 |

ARTICLE 8 TERMINATION OF REPRESENTATIONS AND COVENANTS ...... 34

| | | |
|---|---|---|
| 8.1 | Termination. | 34 |

ARTICLE 9 MISCELLANEOUS ...... 34

| | | |
|---|---|---|
| 9.1 | Legal and Other Fees and Expenses. | 34 |
| 9.2 | Notices. | 35 |
| 9.3 | Further Assurances. | 36 |
| 9.4 | Time of the Essence. | 37 |
| 9.5 | Entire Agreement. | 37 |
| 9.6 | Assignment. | 37 |
| 9.7 | Invalidity. | 37 |
| 9.8 | Waiver and Amendment. | 37 |
| 9.9 | Third-Party Beneficiaries; Bank as Party. | 37 |
| 9.10 | Surviving Provisions on Termination. | 37 |
| 9.11 | Captions. | 38 |
| 9.12 | Counterparts. | 38 |
| 9.13 | Delivery by Facsimile. | 38 |

SCHEDULES AND EXHIBITS

Schedule I              Disclosure Schedule

Schedule 6.1(g)         Consents

Exhibit A               Bidding Procedures Order

Exhibit B               Sale Order

Exhibit C               Plan of Merger Statutory Information

## PLAN OF MERGER AND MERGER AGREEMENT

**THIS PLAN OF MERGER AND MERGER AGREEMENT** (this "**Agreement**") is made as of January 14, 2020 by and among FLORIDA FIRST CITY BANKS, INC., a Florida corporation (the "**Company**"), BEACH COMMUNITY BANK, a Florida banking corporation ("**Purchaser**"), and solely with respect to Sections 5.10, 5.11, 5.12, 5.13, 5.18, 7.4, and 9.9, FIRST CITY BANK OF FLORIDA, a Florida banking corporation (the "**Bank**").

## RECITALS

A.      The Company, Purchaser and the Bank desire to consummate the strategic business combination transaction provided for in this Agreement in which the Bank will, on the terms and conditions set forth in this Agreement, merge (the "**Merger**") with and into Purchaser, with Purchaser as the surviving bank in the Merger and all of the issued and outstanding shares of the Bank (the "**Shares**"), free and clear of all Encumbrances (as hereinafter defined), being cancelled and exchanged for the Merger Consideration (as defined herein).

B.      Each of (a) the Company, as the sole shareholder of the Bank, (b) the board of directors of Purchaser, and (c) the board of directors of the Bank has approved and declared advisable this Agreement and the Merger.

C.      The Company intends to file a voluntary bankruptcy petition (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Northern District of Florida (the "**Bankruptcy Court**") within one Business Day following the date that this Agreement is executed (the date of such filing, the "**Petition Date**").

D.      The parties intend for (i) the Merger (the "**Sale**") to be effectuated pursuant to an order of the Bankruptcy Court under, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, approving such transactions with Purchaser; and (ii) the Merger to qualify as a "reorganization" under the provisions of Section 368(a) of the Code for federal income tax purposes and that this Agreement be and hereby is adopted as a "plan of reorganization" within the meaning of Sections 354 and 361 of the Code.

E.      Purchaser will enter into stock subscription agreements with investors (collectively, the "**Stock Subscription Agreements**"), pursuant to which Purchaser will offer and sell in a private placement of newly issued equity securities of Purchaser (the "**Stock Offering**") for aggregate gross proceeds of approximately $20 million (the "**Gross Offering Proceeds**").

F.      The parties intend that the Contemplated Transactions shall occur simultaneously.

In consideration of the covenants, agreements, representations and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, covenant and agree as follows:

## ARTICLE 1

## INTERPRETATION

1.1     Definitions.  In this Agreement, unless the context otherwise requires or unless otherwise specifically provided herein:

(a)     "Action" means any action, suit, inquiry, notice of violation, proceeding (including any partial proceeding such as a deposition), or investigation pending or, to the Company's Knowledge, threatened in writing against the Company, the Bank, any of their respective Subsidiaries, or any of their respective properties or any officer, director, or employee of the Company, the Bank or any of their respective Subsidiaries acting in his or her capacity as an officer, director, or employee before or by any Governmental Authority.

(b)     "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

(c)     "Affiliated Group" has the meaning given to the term in Code §1504 (or any corresponding provision of state, local or non-U.S. Tax Law).

(d)     "Agency" is defined in Section 3.20(c).

(e)     "Agreement" is defined in the introductory paragraph.

(f)     "Alternative Transaction" means any one of the following transactions with or by a Third Party: (i) a merger, consolidation or similar transaction involving the Company or the Bank, or (ii) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Company or the Bank constituting a majority of the consolidated assets of Company or the Bank.

(g)     "Bank" is defined in the Recitals.

(h)     "Bank Financial Statements" collectively means the Year-End Financial Statements and the Interim Financial Statements.

(i)     "Bank Reports" is defined in Section 3.4.

(j)     "Bank Required Approvals" is defined in Section 3.3(b).

(k)     "Bankruptcy Case" is defined in the Recitals.

(l)     "Bankruptcy Code" is defined in the Recitals.

(m)     "Bankruptcy Court" is defined in the Recitals.

(n)     "BHCA" means the Bank Holding Company Act of 1956, as amended.

(o)     "Bid Procedures" means the bid procedures attached as Exhibit 1 to the Bidding Procedures Order.

2

(p)      "Bid Procedures Motion" is defined in <u>Section 5.6</u>.

(q)      "Bidding Procedures Order" means the bidding procedures order, approving, among other things, the process by which bids may be solicited in connection with the Merger, in the form attached hereto as <u>Exhibit A</u> with such changes as are acceptable to Purchaser and the Company in their respective sole discretion. For the avoidance of doubt, all references to the Bidding Procedures Order shall include the Bid Procedures attached as Exhibit 1 thereto.

(r)      "Break Up Fee" is defined in <u>Section 5.4(a)</u>.

(s)      "Burdensome Condition" means, other than the Consent Order, any action taken, or any law, rule or regulation enacted, entered, enforced or deemed applicable to the Company or its Subsidiaries, the Purchaser (or its Affiliates) or the transactions contemplated by this Agreement, by any bank regulatory authority that imposes any restriction or condition on the Company or its Subsidiaries or the Purchaser or any of its Affiliates that the Purchaser determines, in its reasonable good faith judgment, (i) is materially and unreasonably burdensome on the Bank's or its Subsidiaries' business following the Closing or on the Purchaser (or any of his Affiliates), (ii) would materially reduce the economic benefits of the transactions contemplated by this Agreement to the Purchaser or the Bank, or (iii) requires any modification of governance arrangement with respect to, or imposes any capital or other support requirements on the Purchaser, in each case, to such a degree that the Purchaser would not have entered into this Agreement had such condition or restriction been known to it on the date hereof.

(t)      "Business Day" means any day other than a Saturday, Sunday or any federal holiday in the United States.

(u)      "Business-Related Assets and Contracts" is defined in <u>Section 5.14</u>.

(v)      "Charter Documents" means articles or certificate of incorporation, bylaws and any other comparable constituent document of a corporate entity.

(w)      "Closing" means the completion of the Merger in accordance with <u>Article 7</u>.

(x)      "Closing Date" means (i) the third (3rd) Business Day after the date on which the last of the conditions set forth in <u>Article 6</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions) is satisfied or waived by the appropriate party or (ii) such other date as the Purchaser and the Company mutually agree following the satisfaction or waiver, as applicable, of the conditions set forth in <u>Article 6</u> (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions).

(y)      "Code" means the Internal Revenue Code of 1986, including the regulations and published interpretations thereunder.

(z)      "Common Stock" is defined in <u>Section 3.2(a)</u>.

(aa)     "Company" is defined in the introductory paragraph.

(bb)     "Company Tax Returns" is defined in <u>Section 5.11</u>.

(cc)     "Conformity Election" is defined in <u>Section 5.10(c)</u>.

(dd)     "Consent" means any approval, consent, ratification, waiver or other authorization.

3

(ee)    "Consent Order" means the Modification of an Order to Cease and Desist with respect to the Bank issued by the FDIC, docket number 09-3566, and the FOFR, docket number OFR 0667-FI-08/09, dated December 4, 2017 and consented to by the Bank.

(ff)    "Contemplated Transactions" means all of the transactions contemplated by this Agreement and the Stock Subscription Agreements, including the execution, delivery and performance of all documents, instruments and agreements contemplated hereby.

(gg)    "Contracts" means all contracts, agreements, instruments, leases, indentures and commitments, whether written or oral, relating to the business of the Bank or its Subsidiaries to which the Company, the Bank or any other Subsidiary is a party, including, without limitation, non-competition, non-solicitation and confidentiality agreements.

(hh)    "CRA" is defined in <u>Section 3.3(d)</u>.

(ii)    "Disclosure Schedule" means the disclosure schedule delivered by the Company to the Purchaser concurrently with execution and delivery of this Agreement in the form of Schedule I.

(jj)    "Encumbrance," with respect to any asset, means, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising:

i.    a lien (statutory or otherwise), encumbrance, adverse claim, charge, execution, security interest, pledge against such asset, hypothecation or a subordination to any right or claim of others in respect thereof;

ii.    a claim or interest against such asset;

iii.    an option or other right to acquire such asset, or any interest therein;

iv.    an interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset; and

v.    any other encumbrance of whatsoever nature and kind against such asset.

(kk)    "Environmental Laws" is defined in <u>Section 3.14</u>.

(ll)    "ERISA" is defined in <u>Section 3.9(b)</u>.

(mm)    "Exchange Act" means the Securities Exchange Act of 1934 or any successor statute, and the rules and regulations promulgated thereunder.

(nn)    "FBCA" means the Florida Business Corporation Act.

(oo)    "FDIC" means the Federal Deposit Insurance Corporation, or any successor thereto.

(pp)    "Federal Reserve" means the Board of Governors of the Federal Reserve System.

(qq)    "FFIC" means the Florida Financial Institutions Codes.

(rr)    "Final and Non-appealable" (including, with correlative meaning, the term "final and non-appealable") means, with respect to any Order or other action of a Governmental Authority, an

Order or other action (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or reconsideration, motion for new trial or petition for writ of certiori has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; and (ii) as to which the time for institution or filing an appeal, motion for rehearing or reconsideration, motion for new trial or petition for writ of certiori shall have expired, excluding any additional time periods that may begin as a result of Federal Rule 60(b).

(ss)    "FOFR" means the Florida Office of Financial Regulation.

(tt)    "GAAP" shall mean generally accepted accounting principles as in effect in the United States.

(uu)    "Governmental Authority" means any court, tribunal, administrative agency, arbitrator, branch, department or commission or other governmental or regulatory authority or instrumentality, whether federal, state, local, or foreign (or other political subdivision), and any applicable industry self-regulatory organization or securities exchange.

(vv)    "Governmental Authorization" means any Consent, approval, license, registration, permit or waiver issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

(ww)    "Gross Offering Proceeds" is defined in the Recitals.

(xx)    "Intellectual Property" is defined in Section 3.16.

(yy)    "Interim Financial Statements" means the consolidated unaudited financial statements of the Bank and its Subsidiaries, consisting of consolidated statements of financial condition as of November 30, 2019 and consolidated statements of operations for the eleven months ended November 30, 2019, included in Section 3.6 of the Disclosure Schedule.

(zz)    "Knowledge" of the Company, or words of similar import, including without limitation, the Company being aware of a fact or circumstance, means the actual knowledge as of the date of this Agreement after reasonable investigation of the following officers:  Company Chairman and CEO John McGee, Company President Bob Bennett, Company Chief Executive Officer Steven "Greg" Aldridge, and Company Executive Vice President William "Herb" Tinsley.

(aaa)    "Law" means any federal, state, county, municipal or local ordinance, permit, concession, grant, franchise, law, statute, code, rule, regulation, interpretation or guidance or any judgment, ruling, order, writ, injunction or decree promulgated by any Governmental Authority.

(bbb)    "Lease Agreement" means that certain Amendment to Lease Agreement entered into between Bank and John McGee dated April 1, 2019.

(ccc)    "Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise.

5

(ddd)   "Lien" means any lien, charge, claim, Encumbrance, security interest, right of first refusal, preemptive right, mortgage, deed of trust, pledge, conditional sale agreement, restriction on transfer or other restrictions of any kind.

(eee)   "Material Adverse Effect" means any event, circumstance, change or occurrence that has had or would reasonably be expected to have (a) a material and adverse effect on the legality, validity, or enforceability of this Agreement, (b) a material and adverse effect on the results of operations, assets, properties, business, or condition (financial or otherwise) of the Bank and its Subsidiaries, taken as a whole, or (c) any adverse impairment to the Company's or Bank's ability to perform in any material respect on a timely basis its obligations under this Agreement; *provided, however,* that clause (b) shall not include the impact of (i) the Bankruptcy Case; (ii) Civil Action No.: 1:19-cv-08443-vm in the United States District Court for the Southern District of New York filed by plaintiff Wilmington Trust Company against Company as defendant relating to Company's issuance of an Indenture dated June 15, 2005; (iii) changes in banking and similar Laws of general applicability or interpretations thereof by any applicable Governmental Authority, (iv) changes in GAAP or regulatory accounting requirements applicable to banks generally, (v) changes in general economic conditions, including interest rates, affecting banks generally, (vi) any action required or permitted by this Agreement, or (vii) the effects of any action or omission taken by the Bank with the prior written consent of Purchaser, except, with respect to clauses (iii), (iv) and (v), to the extent that the effect of such changes has a material and disproportionate impact on the Bank and its Subsidiaries, taken as a whole, relative to other similarly situated banks generally.

(fff)   "Material Contract" means any of the following agreements of the Bank or any of its Subsidiaries:

(1) any contract containing covenants that limit in any material respect the ability of the Bank or any of its Subsidiaries to compete in any line of business or with any person or which involve any material restriction of the geographical area in which, or method by which or with whom, the Bank or any of its Subsidiaries may carry on its business (other than as may be required by law or applicable regulatory authorities), and any contract that could require the disposition of any material assets or line of business of the Bank or any of its Subsidiaries;

(2) any joint venture, partnership, strategic alliance, or other similar contract (including any franchising agreement, but in any event excluding introducing broker agreements), and any contract relating to the acquisition or disposition of any material business or material assets (whether by merger, sale of stock or assets, or otherwise), which acquisition or disposition is not yet complete or where such contract contains continuing material obligations or contains continuing indemnity obligations of the Bank or any of its Subsidiaries;

(3) any real property lease and any other lease with annual rental payments aggregating $25,000 or more;

(4) other than with respect to loans, any contract providing for, or reasonably likely to result in, the receipt or expenditure of more than $25,000 on an annual basis, including the payment or receipt of royalties or other amounts calculated based upon revenues or income;

(5) any contract or arrangement under which the Bank or any of its Subsidiaries is licensed or otherwise permitted by a third party to use any Intellectual Property (as herein defined) that is material to its business (except for any "shrinkwrap" or "click through" license agreements or other agreements for software that is generally available to the public and has not been customized for the Bank or any of its

Subsidiaries) or under which a third party is licensed or otherwise permitted to use any Intellectual Property owned by the Bank or any of its Subsidiaries;

(6) any contract that by its terms limits the payment of dividends or other distributions by the Bank or any of its Subsidiaries;

(7) any standstill or similar agreement pursuant to which any party has agreed not to acquire assets or securities of another Person;

(8) any contract that would reasonably be expected to prevent, materially delay, or materially impede the Bank's ability to consummate the transactions contemplated by this Agreement;

(9) any contract providing for indemnification by the Bank or any of its Subsidiaries of any Person, except for immaterial contracts entered into in the ordinary course of business consistent with past practice;

(10) any contract that contains a put, call, or similar right pursuant to which the Bank or any of its Subsidiaries could be required to purchase or sell, as applicable, any equity interests or assets that have a fair market value or purchase price of more than $25,000; and

(11) any other contract or agreement that would be required to be filed as a "material contract" within the meaning of Item 601(b)(10) of Regulation S-K if the Common Stock was registered with the Commission pursuant to the Securities Act or the Exchange Act.

(ggg)    "Material Permit" is defined in Section 3.3(a).

(hhh)    "Merger" is defined in the Recitals.

(iii)    "Merger Consideration" is defined in Section 2.3.

(jjj)    "Money Laundering Laws" is defined in Section 3.19.

(kkk)    "OFAC" is defined in Section 3.3(d).

(lll)    "Order" means any order, judgment, decree, decision, ruling, writ, assessment, charge, stipulation, injunction or other determination of any Governmental Authority, or any arbitration award entered into by an arbitrator, in each case having competent jurisdiction to render such.

(mmm) "Outside Date" means ninety (90) days following the date of this Agreement; *provided*, that if such day is not a Business Day, the first day following such day that is a Business Day; *provided further*, that if on the Outside Date, the conditions set forth in Sections 6.1(l) and 6.1(m) shall not have been satisfied but all other conditions set forth in Sections 6.1, 6.2 and 6.3 shall be satisfied or capable of being satisfied on the Outside Date, then, at Purchaser's sole discretion, the Outside Date shall be extended an additional 30 days.

(nnn)    "Permits" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, orders, certificates, rulings, agreements and other concessions from, of or with Governmental Authorities or other regulatory bodies required to carry on the Business as now being carried on.

7

(ooo)    "Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, sole proprietorship, unincorporated organization, Governmental Authority, or any other form of entity not specifically listed herein.

(ppp)    "Petition Date" is defined in the Recitals.

(qqq)    "Pre-Closing Tax Period" is defined in Section 5.11.

(rrr)    "Purchaser" is defined in the introductory paragraph.

(sss)    "Purchaser Stock" means shares of nonvoting common stock, par value $5.00 per share, of Purchaser.

(ttt)    "Regulatory Agreement" is defined in Section 3.3(c).

(uuu)    "Sale" is defined in the Recitals.

(vvv)    "Sale Motion" is defined in Section 5.6.

(www)    "Sale Order" means the order, approving the Merger, in substantially the form attached hereto as Exhibit B with such changes as are acceptable to Purchaser and the Company in their respective sole discretion.

(xxx)    "Securities Act" means the Securities Act of 1933 or any successor statute, and the rules and regulations promulgated thereunder.

(yyy)    "Shareholder Approval" is defined in Section 6.1(e).

(zzz)    "Shares" is defined in the Recitals.

(aaaa)    "Specified Person" means (i) any Person that has indicated an interest in, or could reasonably be expected to have an interest in, participating in any direct or indirect sale of any equity interest in, or any material portion of the assets of, the Company or the Bank or any extraordinary corporate transaction directly or indirectly involving the Company or the Bank, (ii) any Affiliate of any such Person and (iii) any director, officer, employee, agent, representative or advisor of any such Person or any of its Affiliates.

(bbbb)    "Stock Offering" is defined in the Recitals.

(cccc)    "Stock Subscription Agreements" is defined in the Recitals.

(dddd)    "Subsidiary" includes any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time, directly or indirectly, owned by such party. The term "Subsidiary" shall include all Subsidiaries of any Subsidiary.

(eeee)    "Surviving Corporation" is defined in Section 2.1.

(ffff)    "Tax" or "Taxes" mean (a) any federal, state, local or foreign income, gross receipts, property, sales, use, license, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, profits, withholding, social security (or similar), unemployment, disability, real property, transfer, registration, value added, franchise, employment, payroll, withholding, alternative

8

or add on minimum, ad valorem, transfer or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, or addition thereto imposed by any Governmental Authority, whether disputed or not, and (b) any liability in respect of any items described in clause (a) above payable by reason of contract, assumption, transferee or successor liability, operation of law, Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof or analogous or similar provisions of Law) or otherwise.

      (gggg)     "Tax Matter" is defined in Section 5.13.

      (hhhh)     "Tax Refund" means any Tax refunds from any Governmental Authority.

      (iiii)     "Tax Returns" means any return, declaration, report or similar statement filed or required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax.

      (jjjj)     "Third Party" means any Person or group other than Purchaser and its Affiliates.

      (kkkk)     "Year-End Financial Statements" means (i) the consolidated audited financial statements of the Company and its Subsidiary, consisting of consolidated audited statements of financial condition as of December 31, 2018, and consolidated audited statements of operations, for the year ended December 31, 2018; and (ii) the consolidated audited financial statements of the Company and its Subsidiary, consisting of consolidated audited statements of financial condition as of December 31, 2017, and consolidated audited statements of operations, for the year ended December 31, 2017, both of which are included in Section 3.6 of the Disclosure Schedule.

      1.2     Currency.  Except where otherwise expressly provided, all monetary amounts in this Agreement are stated and shall be paid in United States currency.

      1.3     Governing Law.  This Agreement and the agreements contemplated hereby shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Florida, in each case without regard to the conflict of laws principles thereof or of any other jurisdiction.

      1.4     Schedules and Exhibits.  The following are the Schedules and Exhibits which are attached to and form part of this Agreement:

| | |
|---|---|
| Schedule I | Disclosure Schedule |
| Schedule 6.1(g) | Consents |
| Exhibit A | Bidding Procedures Order |
| Exhibit B | Sale Order |
| Exhibit C | Plan of Merger Statutory Information |

## ARTICLE 2

### THE MERGER

2.1     The Merger.  Subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, at the Effective Time, the Bank shall merge with and into Purchaser in accordance with the FBCA and FFIC.  Upon consummation of the Merger, the separate corporate existence of the Bank shall cease and Purchaser shall survive and continue to exist as a state banking corporation incorporated under the laws of the State of Florida (as the surviving entity in the Merger, sometimes being referred to herein as the "**Surviving Corporation**").  Upon and following consummation of the Merger, the Surviving Corporation shall possess all of the assets, rights, privileges, appointments, powers, licenses, permits and franchises of each of Bank and Purchaser, whether of a public or a private nature, and shall be subject to all of the liabilities, restrictions, disabilities and duties of both Bank and Purchaser, respectively, except for the Consent Order which shall be terminated as of the Effective Time.

2.2     Effective Time.  Subject to the provisions of this Agreement, at Closing, the Parties shall cause the Merger to be consummated by delivery of the Articles of Merger to the FOFR, which shall attach the merger certificate and file the Articles of Merger with the Secretary of State of the State of Florida with respect to the Merger, executed in accordance with the relevant provisions of the FFIC (the "**Articles of Merger**"), and, as soon as practicable following the Closing, shall make all other filings or recordings required under the FFIC with respect to the Merger.  The Merger shall become effective at such time as set forth in the Articles of Merger (the time the Merger becomes effective being the "**Effective Time**").

2.3     Effect on Capital Stock; Payment.  On the Closing Date, the Shares, free and clear of all Encumbrances, shall be cancelled, extinguished and automatically converted into the right to receive 20,000 shares of Purchaser Stock (the "**Merger Consideration**").  Purchaser shall issue and deliver the Merger Consideration to the Company, or its designee, on the Closing Date.

2.4     Articles of Incorporation and Bylaws of the Surviving Corporation.  The Articles of Incorporation of Purchaser at the Effective Time shall be the Articles of Incorporation of the Surviving Corporation.  Until altered, amended or repealed, as therein provided, the Bylaws of Purchaser as in effect at the Effective Time shall be the Bylaws of the Surviving Corporation.

2.5     Directors and Officers of the Surviving Corporation.  The directors and officers of the Surviving Corporation immediately after the Merger shall be the directors and officers of Purchaser in office immediately prior to the Effective Time.

2.6     Plan of Merger.  Attached hereto as Exhibit C is the information required by Section 658.42 of the FFIC that is not otherwise provided herein.

2.7     All Liabilities Excluded.  Notwithstanding any provision in this Agreement to the contrary, Purchaser is not assuming, and shall not be deemed to have assumed, any Liabilities of the Company of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and the Company shall be solely and exclusively liable for any and all such Company Liabilities, including those Liabilities, related to, arising out of or in connection with (x) the operation of its business or (y) the ownership of the Shares, in each case, at any time prior to the Closing Date.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Subject to such exceptions as are disclosed in the Disclosure Schedule dated as of the date hereof and attached hereto, the Company hereby makes the following representations and warranties to Purchaser as of the date hereof and as of the Closing Date; provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date. The inclusion of an item in the Disclosure Schedule shall not be deemed an admission by the Company or the Bank that such item represents a material fact, event, or circumstance or has had or would be reasonably expected to have a Material Adverse Effect. Disclosure in any section of the Disclosure Schedule shall apply only to such section of such Disclosure Schedule; *provided, however*, for purposes of the Disclosure Schedule, any item disclosed on any schedule is deemed to be fully disclosed with respect to all schedules under which the item may be relevant as and to the extent it is reasonably clear on the face of the schedule that the item also applies to the other schedule.

3.1     Corporate Status and Authority; Non-Contravention.

(a)     Status of the Company. The Company is duly organized, validly existing and in good standing under the laws of the State of Florida and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted. The Company is a bank holding company registered under the BHCA. The Company is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, would not in the reasonable judgment of the Company be expected to have a Material Adverse Effect.

(b)     Status of Bank. The Bank is a direct, wholly-owned Subsidiary of the Company, and the Bank is a banking corporation, duly organized, validly existing and in good standing under the laws of Florida and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted. The Bank has no direct or indirect Subsidiaries except as set forth in Section 3.1(b) of the Disclosure Schedule. The Bank owns, directly or indirectly, all of the capital stock (except for any preferred securities issued by Subsidiaries that are trusts) or comparable equity interests of each Subsidiary free and clear of any and all Liens and Encumbrances, and all the issued and outstanding shares of capital stock or comparable equity interest of each Subsidiary are validly issued and are fully paid, non-assessable, and free of preemptive and similar rights to subscribe for or purchase securities. The Bank and each of its Subsidiaries is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, would not in the reasonable judgment of the Company be expected to have a Material Adverse Effect. The Bank's deposit accounts are insured up to applicable limits by the FDIC, and all premiums and assessments required to be paid in connection therewith have been paid when due. The FDIC has not been appointed receiver of the Bank.

(c)     Due Authorization. (i) The Company has full legal right, corporate power and authority to enter into this Agreement and, subject to the Sale Order and receipt of any Bank Required Approvals, to carry out its obligations hereunder and thereunder; and (ii) the execution and delivery of this Agreement and, subject to the Sale Order, the completion and performance of the Contemplated Transactions, have been duly authorized by all necessary corporate action on the part of the Company, and

this Agreement has been duly executed and delivered by the Company and, subject to the Sale Order and receipt of any Bank Required Approvals, constitute legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms. No other corporate proceedings, including any stockholder or debt holder approvals, are necessary for the execution and delivery by the Company of this Agreement, the performance by it of its obligation hereunder or thereunder or the consummation by it of the Contemplated Transactions.

(d) <u>Non-contravention</u>. The execution, delivery, and performance by the Company of this Agreement, and, subject to the Sale Order, the consummation by the Company of the Contemplated Transactions, do not and will not, (i) conflict with or violate any provisions of the Charter Documents of the Company, the Bank or any Subsidiary of the Company or the Bank, (ii) conflict with, or constitute a default (or an event that with notice or lapse of time or both would result in a default) under, result in the creation of any Lien or Encumbrance upon any of the properties or assets of the Company, the Bank or any Subsidiary of the Company or the Bank or give to others any rights of termination, amendment, acceleration, or cancellation (with or without notice, lapse of time or both) of, any agreement, indenture or instrument to which the Company, the Bank or any Subsidiary of the Company or the Bank is a party, or (iii) subject to the receipt of any Bank Required Approvals, conflict with or result in a violation of any Law of any Governmental Authority to which the Company, the Bank or any Subsidiary of the Company or the Bank is subject, or by which any property or asset of the Company, the Bank or any Subsidiary of the Company or the Bank is bound or affected, except in the case of clauses (ii) and (iii) such as would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.2     <u>Capitalization of the Bank.</u>

(a)     <u>Ownership</u>. The authorized and outstanding capital stock of the Bank consists of 41,434 shares of Common Stock, $10.00 par value (the "**Common Stock**"). No other shares of capital stock of the Bank are issued or outstanding. All of the outstanding shares of Common Stock are directly and beneficially owned and held by the Company. All of the outstanding shares of capital stock of the Bank are duly authorized, validly issued, fully paid and non-assessable, have been issued in compliance in all material respects with all applicable federal and state securities laws, and none of such outstanding shares were issued in violation of any preemptive rights or similar rights to subscribe for or purchase any capital stock of the Bank.

(b)     <u>Outstanding Stock Rights</u>. Except as disclosed on <u>Section 3.2(b)</u> of the Disclosure Schedule, (i) no shares of the Bank's outstanding capital stock are subject to preemptive rights or any other similar rights; (ii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls, or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Bank, or contracts, commitments, understandings or arrangements by which the Bank is or may become bound to issue additional shares of capital stock of the Bank or options, warrants, scrip, rights to subscribe to, calls, or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Bank; (iii) there are no material outstanding debt securities, notes, credit agreements, credit facilities or other agreements, documents or instruments evidencing indebtedness of the Bank or any Subsidiary of the Bank or by which the Bank or such Subsidiary is bound; (iv) there are no agreements or arrangements under which the Bank is obligated to register the sale of any of its securities under the Securities Act; (v) there are no outstanding securities, instruments, agreements, commitments, understandings, or arrangements of the Bank that contain any redemption or similar provisions, and there are no contracts, commitments, understandings, or arrangements by which the Bank is or may become bound to redeem a security of the Bank or any of its Subsidiaries; and (vi) neither the Bank nor any of its Subsidiaries has any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement.

(c)     Ownership of Assets Covenant.  Neither the Company nor any of its Subsidiaries (other than the Bank and its Subsidiaries) (i) owns or has any right to use any asset or property (whether real, personal, tangible, intangible or otherwise) used in or held for use in, or related to, the business of the Bank or its Subsidiaries or (ii) is a party to any Contract relating to the business of the Bank or its Subsidiaries.  Neither the Company nor any Subsidiary of the Company (other than the Bank or its Subsidiaries) has or owns any interest in any Tax Refund or any outstanding proceeds related to any insurance claim to the extent related to the Bank or its Subsidiaries or the business of the Bank or its Subsidiaries.

3.3     Business Operations.

(a)     Permits.  The Bank and each of its Subsidiaries possess or have applied for all certificates, authorizations, consents, and permits issued by the appropriate federal, state, local, or foreign regulatory authorities necessary to conduct their respective businesses as currently conducted, except where the failure to possess such certificates, authorizations, consents, or permits, individually or in the aggregate, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (the "**Material Permits**"), and (i) neither the Bank nor any of its Subsidiaries has received any notice in writing of proceedings relating to the revocation or material adverse modification of any such Material Permits, and (ii) none of the Company, the Bank or any Subsidiary of the Bank is aware of any facts or circumstances that would give rise to the revocation or material adverse modification of any Material Permits.

(b)     Government Authorizations.  Subject to the entry of the Sale Order, and except for the filing of applications and notices with, and the receipt of consents, authorizations, approvals, exemptions or non-objections, as applicable, of the Governmental Authorities set forth in Section 3.3(b) of the Disclosure Schedule (the "**Bank Required Approvals**"), no consents or approvals of or filings or registrations with any Governmental Authority are necessary on the part of the Company or its Affiliates in connection with the execution and delivery by the Company of this Agreement and the consummation by the Company and the Bank of the Contemplated Transactions.  As of the date of this Agreement, the Company knows of no reason relating specifically to the Company and its Affiliates why any of the Bank Required Approvals will not be obtained or that any of the Bank Required Approvals will not be granted without imposition of a Burdensome Condition.

(c)     Agreements with Governmental Authorities.  Except for the Consent Order or as otherwise set forth on Section 3.3(c) of the Disclosure Schedule, neither the Bank nor any of its Subsidiaries is subject to any cease-and-desist or other similar order or enforcement action issued by, or is a party to any written agreement, consent agreement, or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any capital directive by, or since December 31, 2015, has adopted any board resolutions at the request of, any Governmental Authority that currently restricts in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its liquidity and funding policies and practices, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management, or its operations or business (each item in this sentence, a "**Regulatory Agreement**"), nor has the Bank or any of its Subsidiaries been advised in writing since December 31, 2016 by any Governmental Authority that it intends to issue, initiate, order, or request any such Regulatory Agreement.

(d)     Compliance with Certain Banking Regulations.  To the Company's Knowledge, there are no facts or circumstances, and the Company has no reason to believe that any facts or circumstances exist, that would cause the Bank or any applicable Subsidiary (i) to be deemed not to be in satisfactory compliance with the Community Reinvestment Act ("**CRA**") and the regulations promulgated thereunder or to be assigned a CRA rating by federal or state banking regulators of lower than "satisfactory,"

13

(ii) to be deemed to be operating in violation of the Bank Secrecy Act, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, any order issued with respect to anti-money laundering by Office of Foreign Assets Control of the Treasury ("**OFAC**"), or any other anti-money laundering statute, rule, or regulation, (iii) to be deemed not to be in satisfactory compliance with the Home Mortgage Disclosure Act, the Fair Housing Act, the Community Reinvestment Act, the Equal Credit Opportunity Act, or (iv) to be deemed not to be in satisfactory compliance, in any material respect, with all applicable privacy of customer information requirements contained in any applicable federal and state privacy laws and regulations as well as the provisions of all information security programs adopted by the Bank.

   (e) <u>Compliance</u>. To the Company's Knowledge, neither the Bank nor any of its Subsidiaries (i) is in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by the Bank or any of its Subsidiaries under), nor has the Bank or any of its Subsidiaries received written notice of a claim that it is in default under or that it is in violation of, any Material Contract (whether or not such default or violation has been waived), (ii) except as set forth on <u>Section 3.3(e)</u> of the Disclosure Schedule, is in violation of, or in receipt of written notice that it is in violation of, any order of which the Bank has been made aware in writing of any court, arbitrator, or governmental body having jurisdiction over the Bank or its Subsidiaries or their respective properties or assets, (iii) is in violation of, or in receipt of written notice that it is in violation of, any statute, rule, regulation, policy, guideline, or order (other than the Consent Order) of any Governmental Authority applicable to the Bank or any of its Subsidiaries, or which would have the effect of revoking or limiting FDIC deposit insurance.

  3.4 <u>Regulatory Reports</u>. Since January 1, 2017, the Bank and each Subsidiary have filed all material reports, registrations, and statements, together with any required amendments thereto, that it was required to file with the FDIC, the FOFR, and any other applicable federal or state securities or banking authorities. All such reports and statements filed with any such regulatory body or authority are collectively referred to herein as the "Bank Reports." All such Bank Reports were filed on a timely basis or the Bank or the applicable Subsidiary, as applicable, received a valid extension of such time of filing and has filed any such Bank Reports prior to the expiration of any such extension. As of their respective dates, the Bank Reports complied in all material respects with all the rules and regulations promulgated by the FDIC, the FOFR, and any other applicable foreign, federal, or state securities or banking authorities, as the case may be.

  3.5 <u>Unlawful Payments</u>. Neither the Bank nor any of its Subsidiaries, nor to the Company's Knowledge, any directors, officers, employees, agents, or other Persons acting at the direction of or on behalf of the Bank or any of its Subsidiaries has, in the course of its actions for, or on behalf of, the Bank or any of its Subsidiaries (a) directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment, or other unlawful expenses relating to foreign or domestic political activity, (b) made any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) violated any provision of the Foreign Corrupt Practices Act of 1977, or (d) made any other unlawful bribe, rebate, payoff, influence payment, kickback, or other material unlawful payment to any foreign or domestic government official or employee.

  3.6 <u>Financial Matters.</u>

   (a) <u>Bank Financial Statements</u>. The Company has, prior to the date hereof, provided (by hard copy, electronic data room access or otherwise) to Purchaser the Bank Financial Statements. Except as set forth on <u>Section 3.6(a)</u> of the Disclosure Schedule, the Bank Financial Statements (i) have been prepared in accordance with GAAP (except for the omission of footnotes) and regulatory accounting

principles using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the audited Year-End Financial Statements and (ii) fairly present in all material respects the consolidated financial position of the Company, the Bank and the Subsidiaries of the Company and the Bank as of the respective dates set forth therein and their consolidated results of operations, for the periods set forth therein, subject, in the case of the Interim Financial Statements, to normal respective year-end adjustments, which would not be material, either individually or in the aggregate.

(b)     Internal Controls. Since December 31, 2017, the Bank has not been advised of any material deficiencies in the design or operation of internal control over financial reporting or any fraud, whether or not material, that involves management. Since December 31, 2017, no material weakness in internal control over financial reporting has been identified by the Company's and the Bank's auditors, and since the date of the most recent evaluation thereof, there have been no significant changes in internal control over financial reporting that could reasonably be expected to materially and adversely affect internal control over financial reporting.

(c)     Off Balance Sheet Arrangements. There is no transaction, arrangement, or other relationship between the Bank (or any of its Subsidiaries) and an unconsolidated or other off-balance sheet entity that is required to be disclosed by the Bank in the Bank Financial Statements and is not so disclosed.

(d)     No Undisclosed Liabilities. There are no material liabilities or obligations of the Bank or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable, or otherwise, except for (i) liabilities appropriately reflected or reserved against in accordance with GAAP in the Bank's Financial Statements or that are otherwise disclosed in the footnotes to the financial statements for the year ended December 31, 2018, and (ii) liabilities that have arisen in the ordinary and usual course of business and consistent with past practice since December 31, 2018.

3.7     Tax Matters. The Bank and each of its Subsidiaries (or the Company on behalf of the Bank and its Subsidiaries) has filed all material foreign, U.S. federal, state and local Tax Returns that are or were required to be filed, and all such Tax Returns are true, correct and complete in all material respects and were prepared in substantial compliance with all applicable Laws and regulations. All material Taxes due and owing by the Bank or any of its Subsidiaries (whether or not shown on any Tax Return) and any other material assessment, fine or penalty levied against it have been paid, other than any such amounts (i) currently payable without penalty or interest, or (ii) being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP. There are no Liens or Encumbrances for Taxes (other than Taxes not yet due and payable) on any assets of the Bank or its Subsidiaries.

(b)     The Bank and each of its Subsidiaries have timely withheld, collected or deposited as the case may be all material Taxes (determined both individually and in the aggregate) required to be withheld, collected or deposited by it, and to the extent required, have been paid to the relevant taxing authority in accordance with applicable Law. Each of the Bank and its Subsidiaries has complied with all applicable information reporting requirements in all material respects.

(c)     Neither the Company, the Bank, nor any of their Subsidiaries is subject to any outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company, the Bank or any of their Subsidiaries either within the Company's Knowledge or claimed, pending or raised by an authority in writing. No claim has been made by a tax authority in a jurisdiction where the Company, the Bank or any of their Subsidiaries does not pay Taxes or file Tax Returns asserting that the Company, the Bank or any of their Subsidiaries is or may be subject to Taxes assessed by such jurisdiction.

(d)     Neither the Bank nor any of its Subsidiaries is a party to any agreement, contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of (i) any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local or non-U.S. Tax Law) or (ii) any amount that will not be fully deductible as a result of Code §162(m) (or any corresponding provision of state, local or non-U.S. Tax Law). Neither the Bank nor any of its Subsidiaries has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii). Each of the Company, the Bank and their Subsidiaries have disclosed on their federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662. Neither the Bank nor any of its Subsidiaries is a party to or bound by any Tax allocation, Tax sharing or Tax indemnification agreement or similar contract or arrangement (other than a tax allocation policy adopted by the Company, which is set forth in Section 3.7(d) of the Disclosure Schedule). Neither the Bank nor any of its Subsidiaries (A) has been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was the Company) or (B) has any Liability for the Taxes of any Person (other than the Bank or any of its Subsidiaries) under Treas. Reg. 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract or otherwise.

(e)     Neither the Bank nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing as a result of any:

(A) installment sale or other open transaction disposition made on or prior to the Closing;

(B) prepaid amount received on or prior to the Closing;

(C) written and legally binding agreement with a Governmental Authority relating to taxes entered into before the Closing;

(D) change in method of accounting in any taxable period ending on or before the Closing;

(E) election under Section 108(i) of the Code;

(F) use of an improper method of accounting for a taxable period ending on or before the Closing Date; or

(G) intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding provision of state, local or non-U.S. Tax Law).

(f)     Section 3.7(f) of the Disclosure Schedule sets forth, with respect to each of the Bank and its Subsidiaries as of the most recent practicable date, the amount of any net operating loss, net capital loss, unused investment or other credit, unused foreign tax credit, or excess charitable contribution allocable to the Bank or its Subsidiaries.

(g)     Neither the Bank nor any of its Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

16

(h)     Neither the Bank nor any of its Subsidiaries is or has been a party to any "reportable transaction," as defined in Code §6707A(c)(1) and Reg. §1.6011-4(b).

(i)     Neither the Bank nor any of its Subsidiaries (A) is a "controlled foreign corporation" as defined in Code §957, (B) is a "passive foreign investment company" within the meaning of Code §1297, or (C) has a permanent establishment (within the meaning of an applicable Tax treaty ) or otherwise has an office or fixed place of business in a country other than the country in which it is organized.

(j)     Neither the Bank nor any of its Subsidiaries has received any letter ruling from the Internal Revenue Service (or any comparable ruling from any other taxing authority).

(k)     The Affiliated Group of which the Company is the common parent has filed all material income Tax returns that it was required to file for each taxable period during which any of the Bank or its Subsidiaries was a member of the Affiliated Group. All such Tax Returns were correct and complete (i) in all material respects as they relate to the Bank or any of its Subsidiaries and (ii) in all material respects in so far as they do not relate to the Bank or any of its Subsidiaries. All income Taxes owed by such Affiliated Group (whether or not shown on any Tax Returns) have been paid for each taxable period during which any of the Bank and its Subsidiaries was a member of the Affiliated Group.

(l)     None of the net operating losses, tax credits and other relevant Tax attributes of the Bank and its Subsidiaries is subject to limitations under Code §382 or §383.

3.8     <u>Litigation</u>. There is no Action pending or, to the Company's Knowledge, threatened, which (a) adversely affects or challenges the legality, validity, or enforceability of this Agreement, the Merger or the Business-Related Assets and Contracts pursuant to this Agreement or (b) except as set forth on <u>Section 3.8</u> of the Disclosure Schedule, is reasonably likely to be material to the Bank or any of its Subsidiaries, individually or in the aggregate, if there were an unfavorable decision. Except as set forth on <u>Section 3.8</u> of the Disclosure Schedule, neither the Bank nor any of its Subsidiaries, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities Laws or a claim of breach of fiduciary duty nor is any Action, to the Company's Knowledge, currently threatened. There is no Action by the Bank or any of its Subsidiaries pending or which the Bank or any of its Subsidiaries intends to initiate (other than collection or similar claims in the ordinary course of business). With the exception of the Consent Order, there are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Bank or any executive officers or directors of the Bank in their capacities as such, which individually or in the aggregate, would reasonably be expected to be material to the Bank or any of its Subsidiaries.

3.9     <u>Employee Matters.</u>

(a)     <u>Employees</u>. No labor dispute exists or, to the Company's Knowledge, is imminent with respect to any of the employees of the Bank or any of its Subsidiaries which would have or reasonably be expected to have a Material Adverse Effect. None of the employees of the Bank or any of its Subsidiaries is a member of a union that relates to such employee's relationship with the Bank or any of its Subsidiaries, and neither the Bank nor any of its Subsidiaries is a party to a collective bargaining agreement, and the Company believes that the Bank's and each of its Subsidiary's relationship with its employees is good. To the Company's Knowledge, there is no activity involving any of the employees of the Bank or any of its Subsidiaries seeking to certify a collective bargaining unit or similar organization. To the Company's Knowledge, no executive officer is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of a third party, and to

17

the Company's Knowledge, the continued employment of each such executive officer does not subject the Bank or any of its Subsidiaries to any liability with respect to any of the foregoing matters. The Bank and each of its Subsidiaries are in compliance with all material Laws and regulations relating to employment and employment practices, immigration, terms and conditions of employment and wages and hours. As of the date of this Agreement, except as otherwise disclosed in Section 3.9(a) of the Disclosure Schedule, no material employee has given notice to the Bank or any of its Subsidiaries of his or her intent to terminate his or her employment or service relationship with the Bank or any of its Subsidiaries. The Bank and its Subsidiaries are in material compliance with all Laws concerning the classification of employees and independent contractors and have properly classified all such individuals for purposes of participation in employee benefit plans.

(b)     ERISA. The Bank and its Subsidiaries are in compliance in all material respects with all presently applicable provisions of the Employee Retirement Income Security Act of 1974, including the regulations and published interpretations thereunder ("**ERISA**"), and there is no pending or, to the Company's Knowledge, threatened Action relating to a benefit plan (other than routine claims for benefits) maintained by or for the benefit of the Bank and its Subsidiaries (each, a "**Benefit Plan**"), and no Benefit Plan has within the three (3) years prior to the date hereof been the subject of an examination or audit by a Governmental Authority; no "reportable event" (as defined in ERISA) has occurred with respect to any "pension plan" (as defined in ERISA) for which the Bank or any of its Subsidiaries would have any liability; the Bank and its Subsidiaries have not incurred and the Company does not expect the Bank and its Subsidiaries to incur liability under (i) Title IV of ERISA with respect to termination of, or withdrawal from, any "pension plan," or (ii) Sections 412 or 4971 of the Code; and each "Pension Plan" or other employee benefit plan for which the Bank or any of its Subsidiaries would have liability that is intended to be qualified under Section 401(a) of the Code is so qualified in all material respects and nothing has occurred, whether by action or by failure to act, which would cause the loss of such qualification.

3.10     Properties and Leases. Except for the property on which the Bank's Destin branch location sits, which such property is covered by the Lease Agreement, the Bank and its Subsidiaries have good and marketable title to all real property and tangible personal property owned or used by them which is material to the business of the Bank and its Subsidiaries, taken as a whole, in each case free and clear of all Liens and Encumbrances, except such as do not materially affect the value of such property or do not interfere with the use made and proposed to be made of such property by the Bank and any of its Subsidiaries. Any real property and facilities held under lease by the Bank and any of its Subsidiaries are held by them under valid, subsisting, and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and facilities by the Bank and its Subsidiaries. No notice of a claim of default by any party to any lease entered into by the Bank or any of its Subsidiaries has been delivered to either the Bank or any of its Subsidiaries or is now pending, and there does not exist any event or circumstance that with notice or passing of time, or both, would constitute a default or excuse performance by any party thereto. None of the owned or leased premises or properties of the Bank or any of its Subsidiaries is subject to any current or potential interests of third parties or other restrictions or limitations that would impair or be inconsistent in any material respect with the current use of such property by the Bank or any of its Subsidiaries, as the case may be.

3.11     Material Changes. Since December 31, 2018, except as disclosed in the Interim Financial Statements, or otherwise disclosed on Section 3.11 of the Disclosure Schedule, (a) there have been no events, occurrences, or developments that have had or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (b) the Bank has not incurred any material liabilities (contingent or otherwise) other than (i) trade payables, accrued expenses, and other liabilities incurred in the ordinary course of business consistent with past practice, and (ii) liabilities not required to be reflected in the Bank Financial Statements pursuant to GAAP, (c) the Bank has not altered materially its method of accounting or the manner in which it keeps its accounting books and records,

18

(d) there has not been any material change or amendment to, or any waiver of any material right by the Bank under, any Material Contract under which the Bank or any of its Subsidiaries is bound or subject, and (e) to the Company's Knowledge, there has not been an increase in the aggregate dollar amount of (i) the Bank's nonperforming loans (including nonaccrual loans and loans ninety (90) days or more past due and still accruing interest) or (ii) the reserves or allowances established on the Bank Financial Statements with respect thereto.

3.12    Material Contracts. The Company has made available to the Purchaser (by hard copy, electronic data room access or otherwise), prior to the date hereof, true, correct, and complete copies of each Material Contract to which the Bank or any of its Subsidiaries is a party or subject (whether written or oral, express or implied) as of the date of this Agreement. Each Material Contract is a valid and binding obligation of the Bank or any of its Subsidiaries (as applicable) that is a party thereto and, to the Company's Knowledge, each other party to such Material Contract, except for such failures to be valid and binding as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Each such Material Contract is enforceable against the Bank or any of its Subsidiaries (as applicable) that is a party thereto and, to the Company's Knowledge, each other party to such Material Contract in accordance with its terms (subject in each case to applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding of law or at equity), except for such failures to be enforceable as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Neither the Bank nor any of its Subsidiaries, nor to the Company's Knowledge, any other party to a Material Contract, is in material default or material breach of a Material Contract and there does not exist any event, condition or omission that would constitute such a default or breach (whether by lapse of time or notice or both), in each case, except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Set forth on Section 3.12 of the Disclosure Schedule is a true and complete list of the products and services as well as the remaining terms for such products and services and the remaining term for the underlying master agreement with respect to the Bank's Material Contract with its core processor.

3.13    Risk Management Instruments. To the Company's Knowledge, the Bank and its Subsidiaries have in place risk management policies and procedures sufficient in scope and operation to protect against risks of the type and in amounts reasonably expected to be incurred by companies of similar size and in similar lines of business as the Bank and its Subsidiaries. Except as has not had or would not reasonably be expected to have a Material Adverse Effect, since January 1, 2018, all derivative instruments, including, swaps, caps, floors, and option agreements, whether entered into for the Bank's own account, or for the account of one or more of its Subsidiaries, were entered into (a) only in the ordinary course of business, (b) in accordance with prudent practices and in all respects with all applicable Laws, rules, regulations, and regulatory policies, and (c) with counterparties believed to be financially responsible at the time, and each of them constitutes the valid and legally binding obligation of the Bank or one of its Subsidiaries, enforceable in accordance with its terms. Neither the Bank nor its Subsidiaries, nor, to the Company's Knowledge, any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

3.14    Environmental Matters. To the Company's Knowledge, neither the Bank nor any of its Subsidiaries (a) is in violation of any Law of any relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances (collectively, "**Environmental Laws**"), (b) is liable for any off-site disposal or contamination pursuant to any Environmental Laws, (c) owns or operates any real property contaminated with any substance that is in violation of any Environmental Laws or (d) is subject to any claim relating to any Environmental Laws; in each case, which violation, contamination, liability or claim has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse

Effect; and there is no pending or, to the Company's Knowledge, threatened investigation that might lead to such a claim. To the Company's Knowledge, except as would not result in a Material Adverse Effect, there are no circumstances or conditions (including the presence of asbestos, underground storage tanks, lead products, polychlorinated biphenyls, prior manufacturing operations, dry-cleaning or automotive services) involving the Bank or any of its Subsidiaries, or any currently or formerly owned or operated property of the Bank or any of its Subsidiaries, that could reasonably be expected to result in any claim, liability, investigation, cost or restriction against the Bank or any of its Subsidiaries, or result in any restriction on the ownership, use, or transfer of any property pursuant to any Environmental Law, or adversely affect the value of any currently owned property of the Bank or any of its Subsidiaries.

3.15    Insurance. The Bank and each of its Subsidiaries are, and following the Closing will remain, insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as the Bank reasonably believes to be prudent and customary in the businesses and locations in which and where the Bank and its Subsidiaries are engaged. The Bank and the Bank Subsidiaries have not been refused any insurance coverage sought or applied for, and the Company does not have any reason to believe that the Bank and its Subsidiaries will not be able to renew their existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue their business at a cost that would not have a Material Adverse Effect. All premiums due and payable under all such policies and bonds have been timely paid, and the Company, the Bank and its Subsidiaries are in material compliance with the terms of such policies and bonds. Neither the Bank nor any of its Subsidiaries has received any notice of cancellation of any such insurance, nor, to the Company's Knowledge, will the Bank or any of its Subsidiaries be unable to renew their respective existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would be materially higher than their existing insurance coverage. The Bank (a) maintains directors' and officers' liability insurance and fiduciary liability insurance with financially sound and reputable insurance companies with benefits and levels of coverage as disclosed in Section 3.15 of the Disclosure Schedule, (b) has timely paid all premiums on such policies, and (c) there has been no lapse in coverage during the term of such policies.

3.16    Intellectual Property. The Bank and its Subsidiaries own, possess, license, or have other rights to use all foreign and domestic patents, patent applications, trade and service marks, trade and service mark registrations, trade names, copyrights, inventions, trade secrets, technology, Internet domain names, know-how, and other intellectual property (collectively, the "**Intellectual Property**") necessary for the conduct of their respective businesses as now conducted or as proposed to be conducted except where the failure to own, possess, license, or have such rights would not have or reasonably be expected to have a Material Adverse Effect. Except where such violations or infringements would not have or reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (a) there are no rights of third parties to any such Intellectual Property, (b) there is no infringement by third parties of any such Intellectual Property, (c) there is no pending or threatened action, suit, proceeding, or claim by others challenging the Bank's and its Subsidiaries' rights in or to any such Intellectual Property, (d) there is no pending or threatened action, suit, proceeding, or claim by others challenging the validity or scope of any such Intellectual Property, and (e) there is no pending or threatened action, suit, proceeding, or claim by others that the Bank and/or any of its Subsidiaries infringes or otherwise violates any patent, trademark, copyright, trade secret, or other proprietary rights of others. Section 3.16 of the Disclosure Schedule sets forth a true and complete list of all registrations and applications for registration of Intellectual Property owned by the Company, the Bank or its Subsidiaries.

3.17    Related Party Transactions. Except as set forth in Section 3.17 of the Disclosure Schedule, none of the officers or directors of the Bank and, to the Company's Knowledge, none of the employees or Affiliates of the Bank, is presently a party to any contract, arrangement or transaction with

the Bank, the Company or any Affiliate (other than for services as employees, officers and directors) that would be required to be disclosed pursuant to Item 404 of Regulation S-K promulgated under the Securities Act if the Common Stock was required to be registered with the Commission under the Securities Act or the Exchange Act. All agreements between the Bank and any of its Affiliates comply with the Federal Reserve's Regulation W to the extent applicable in accordance with Section 18(J) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(J).

3.18    No Additional Agreements. Except as set forth on Section 3.18 of the Disclosure Schedule, the Company has no agreements or understandings (including, without limitation, side letters) with any other Person with respect to the Merger on terms that are different from those set forth herein. The Company does not have any agreement or understanding with Purchaser with respect to the Contemplated Transactions other than as specified in this Agreement.

3.19    Anti-money Laundering. The operations of each of the Bank and each of its Subsidiaries are, and have been conducted at all times, in compliance in all material respects with the money laundering statutes of applicable jurisdictions, the rules and regulations thereunder, and any related or similar rules, regulations, or guidelines, issued, administered, or enforced by any applicable governmental agency (collectively, the "**Money Laundering Laws**"), and to the Company's Knowledge, no action, suit, or proceeding by or before any court or governmental agency, authority, or body or any arbitrator involving the Bank and/or any Subsidiary of the Bank with respect to the Money Laundering Laws is pending or threatened.

3.20    Mortgage Banking Business.    Except as has not had and would not reasonably be expected to have a Material Adverse Effect:

(a)    The Bank and each of its Subsidiaries has complied with, and all documentation in connection with the origination, processing, underwriting, and credit approval of any mortgage loan originated, purchased, or serviced by the Bank or any of its Subsidiaries satisfied, (i) all applicable federal, state, and local Laws, rules, and regulations with respect to the origination, insuring, purchase, sale, pooling, servicing, subservicing, or filing of claims in connection with mortgage loans, including all Laws relating to real estate settlement procedures, consumer credit protection, truth in lending Laws, usury limitations, fair housing, transfers of servicing, collection practices, equal credit opportunity, and adjustable rate mortgages, (ii) the responsibilities and obligations relating to mortgage loans set forth in any agreement between the Bank or any of its Subsidiaries and any Agency, Loan Investor, or Insurer, (iii) the applicable rules, regulations, guidelines, handbooks, and other requirements of any Agency, Loan Investor, or Insurer, and (iv) the terms and provisions of any mortgage or other collateral documents and other loan documents with respect to each mortgage loan; and

(b)    No Agency, Loan Investor, or Insurer has (A) claimed in writing that the Bank or any of its Subsidiaries has violated or has not complied with the applicable underwriting standards with respect to mortgage loans sold by the Bank or any of its Subsidiaries to a Loan Investor or Agency, or with respect to any sale of mortgage servicing rights to a Loan Investor, (B) imposed in writing restrictions on the activities (including commitment authority) of the Bank or any of its Subsidiaries, or (C) indicated in writing to the Bank or any of its Subsidiaries that it has terminated or intends to terminate its relationship with the Bank or any of its Subsidiaries for poor performance, poor loan quality, or concern with respect to the Bank's or any of its Subsidiaries' compliance with Laws.

(c)    For purposes of this Section 3.20, (1) "**Agency**" means the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, the Farmers Home Administration (now known as Rural Housing and Community Development Services), the Federal National Mortgage Association, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S.

21

Department of Agriculture, or any other federal or state agency with authority to (A) determine any investment, origination, lending, or servicing requirements with regard to mortgage loans originated, purchased, or serviced by the Bank or any of its Subsidiaries, or (B) originate, purchase, or service mortgage loans, or otherwise promote mortgage lending, including state and local housing finance authorities, (2) **"Loan Investor"** means any Person (including an Agency) having a beneficial interest in any mortgage loan originated, purchased, or serviced by the Bank or any of its Subsidiaries or a security backed by or representing an interest in any such mortgage loan, and (3) **"Insurer"** means a Person who insures or guarantees for the benefit of the mortgagee all or any portion of the risk of loss upon borrower default on any of the mortgage loans originated, purchased, or serviced by the Bank or any of its Subsidiaries, including the Federal Housing Administration, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture, and any private mortgage insurer, and providers of hazard, title, or other insurance with respect to such mortgage loans or the related collateral.

     3.21    Nonperforming Assets.  As of the date hereof, except as set forth in Section 3.21 of the Disclosure Schedule, to the Company's Knowledge, the Company believes that the Bank will be able to fully and timely collect substantially all interest, principal, or other payments when due under its loans, leases, and other assets that are not classified as nonperforming and such belief is reasonable under all the facts and circumstances known to the Company, and the Company believes that the amount of reserves and allowances for loan and lease losses and other nonperforming assets established on the Bank Financial Statements is adequate, and such belief is reasonable under all the facts and circumstances known to the Company.

     3.22    Brokers or Finders.  Neither the Company nor the Bank nor its Subsidiaries, nor any of their representatives, have incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payments in connection with the Contemplated Transactions.

     3.23    Tax Treatment of the Merger.  The Company has no Knowledge of any fact or circumstance relating to it that would prevent the transactions contemplated by this Agreement from qualifying as a reorganization under Section 368(a) of the Code.

### ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

     Purchaser hereby makes the following representations and warranties to the Company as of the date hereof and as of the Closing Date; provided that those representations and warranties which address matters only as of a particular earlier date shall be required to be true and correct only on such date.

     4.1    Entity Status and Authority; Non-contravention.

         (a)    Status of Purchaser.  Purchaser is a banking corporation duly organized, validly existing and in good standing under the laws of the State of Florida and has all requisite corporate power and authority necessary to own, lease or operate all of its properties and assets and to carry on its business as it is now being conducted.

         (b)    Due Authorization.

            (i)    Subject to Shareholder Approval, the execution, delivery, and performance by Purchaser of this Agreement and the transactions contemplated by this Agreement have been duly authorized by all necessary action on the part of Purchaser.  This Agreement has been duly executed by Purchaser, and when delivered by Purchaser in accordance with the terms hereof and subject

22

to Shareholder Approval, will constitute the valid and legally binding obligation of Purchaser, and subject to the approval of the Bankruptcy Court, is enforceable against it in accordance with its terms.

(c)     Non-contravention. The execution, delivery, and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby will not (i) result in a violation of the organizational documents of Purchaser, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, or instrument to which Purchaser is a party, or (iii) subject to entry of the Sale Order and to the receipt of all Bank Required Approvals, result in a violation of any Law applicable to Purchaser, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights, or violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the ability of Purchaser to perform its obligations hereunder.

4.2     Governmental Authorizations. Subject to entry of the Sale Order, the required notices related to the Stock Offering and receipt of the Bank Required Approvals, no consents, or approvals of or filings or registrations with any Governmental Authority are necessary on the part of Purchaser or its Affiliates in connection with the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the Contemplated Transactions to which Purchaser is a party.

4.3     Capitalization. As of the Closing, the shares of Purchaser Stock to be issued in exchange for the Shares upon consummation of the Merger in accordance with this Agreement will be duly authorized and when issued in accordance with the terms of this Agreement, will be validly issued, fully paid and nonassessable.

4.4     Litigation and Claims. Other than the Bankruptcy Case, there are no current, pending or, to the knowledge of Purchaser, threatened Actions against or relating to Purchaser that would reasonably be expected to materially interfere with or delay any of the Contemplated Transactions.

4.5     Regulatory Capitalization. Purchaser is, and, after taking into consideration the Gross Offering Proceeds, will be upon consummation of the Contemplated Transactions by this Agreement, "well-capitalized," as such term is defined in the rules and regulations promulgated by the FDIC.

4.6     Tax Treatment of the Merger. Purchaser has no knowledge of any fact or circumstance relating to it that would prevent the transactions contemplated by this Agreement from qualifying as a reorganization under Section 368(a) of the Code.

4.7     Stock Offering. Purchaser will timely and faithfully pursue completion of the Stock Offering and will use reasonable best efforts to achieve full subscription for the Gross Offering Proceeds.

## ARTICLE 5

## PRE-CLOSING MATTERS AND OTHER COVENANTS

5.1     Conduct of Business. The Company shall cause the Bank and its Subsidiaries to: (a) operate their business in the ordinary course consistent with safe and sound banking practices; (b) preserve intact the current business organization of the Bank; (c) use commercially reasonable efforts to retain the services of their employees, consultants, and agents; (d) use commercially reasonable efforts to preserve the current relationships of the Bank and its Subsidiaries with material customers and other Persons with whom the Bank and its Subsidiaries have and intend to maintain significant relations; (e) maintain all of its operating assets in their current condition (normal wear and tear excepted); (f) refrain

from taking or omitting to take any action that would constitute a breach of <u>Section 3.11</u>; (g) refrain from taking any action that would prevent or impede the Merger from qualifying as a reorganization within the meaning of Section 368 of the Code; and (h) refrain from (i) declaring, setting aside or paying any distributions or dividends on, or making any distributions (whether in cash, securities, or other property) in respect of, any of its capital stock, (ii) splitting, combining or reclassifying any of its capital stock or issuing or authorizing the issuance of any other securities in respect of, in lieu of or in substitution for capital stock or any of its other securities, or (iii) purchasing, redeeming or otherwise acquiring any capital stock, assets and other securities or any rights, warrants or options to acquire any such capital stock, assets or other securities, other than acquisitions of investment securities in the ordinary course of business.

    5.2    <u>Consents and Approvals.</u>

    (a)    <u>Bank Required Approvals.</u>  Purchaser and the Company agree to use commercially reasonable efforts to obtain all Bank Required Approvals, and to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under any applicable Law to consummate the Contemplated Transactions.  For the avoidance of doubt, none of the obligations in this <u>Section 5.2</u> shall require Purchaser to take any action that would result in the imposition of a Burdensome Condition.

    (b)    <u>Preparation of Applications.</u>  As promptly as practicable following the execution and delivery of this Agreement, but in no event later than ten (10) Business Days thereafter, Purchaser, with the cooperation of the Company and the Bank, shall cause to be published all required notices and prepare all necessary documentation and effect all necessary filings in connection with obtaining the Bank Required Approvals.  Purchaser and the Company will cooperate with each other and will each furnish the other and the other's counsel with all information reasonably requested concerning themselves, their Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any application, petition or any other statement or application made by or on behalf of Purchaser, the Company or their respective Subsidiaries to any Governmental Authority in connection with the Contemplated Transactions.  Purchaser and the Company shall have the right to review and approve in advance all non-confidential information relating to them and any of their respective Subsidiaries which appear in any filing made, or written materials submitted, in connection with the Contemplated Transactions with any Governmental Authority.

    (c)    <u>Submission of Applications for Bank Required Approvals.</u>  Purchaser and the Company shall use their commercially reasonable efforts to:

        (i)    cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry relating to the Bank Required Approvals, including, but not limited to, Purchaser, the Company and the Bank cooperating and using commercially reasonable efforts to make, on a timely basis, all registrations, filings and applications with, give all notices to, and obtain any approvals, orders, qualifications and waivers from a Governmental Authority necessary for the consummation of the transactions contemplated hereby; provided, however, that neither the Company or any of its Affiliates nor Purchaser or any of its Affiliates shall be required to commence or be a plaintiff in any litigation in connection with any such registration, filing, application, notice, approval, order, qualification or waiver.  In addition, nothing herein shall require the Purchaser to take any action that would result in the imposition of a Burdensome Condition;

        (ii)    subject to any Law, permit each other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written communication (or other correspondence or memoranda) between any such party and any Governmental Authority relating to the other party; and

(iii)    subject to any Law, promptly inform each other of and supply to each other any non-confidential portion of written communication (or other correspondence or memoranda) submitted to (except to the extent such submission is confidential), or received by them from, any Governmental Authority, in each case regarding any of the Contemplated Transactions.

5.3    Notice of Certain Events. The Company shall promptly notify Purchaser in writing of:

(a)    any notice or other material written or oral communication from any Person other than a Governmental Authority in connection with the Contemplated Transactions;

(b)    any actions, suits, claims, investigations or proceedings commenced or, to its Knowledge, threatened against, relating to or involving or otherwise affecting the Company or the Bank or its Subsidiaries that, if pending on the date hereof, would have been required to have been disclosed pursuant to Section 3.8 or that could reasonably be expected to adversely affect or delay the Company's ability to consummate any of the Contemplated Transactions;

(c)    any circumstance, event or action the existence, occurrence or taking of which could reasonably be expected to result in any representation or warranty made by the Company in this Agreement not being true and correct or that could reasonably be expected to cause any condition set forth in Section 6.1 or Section 6.3 not to be satisfied; and

(d)    any failure of the Company to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

No information received by Purchaser pursuant to this Section 5.3 or otherwise shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the Company in this Agreement, nor shall any such information be deemed to change, supplement or amend the Disclosure Schedule.

5.4    Break Up Fee.

(a)    In consideration for Purchaser serving as the stalking-horse bidder and this Agreement being subject to termination in the event that the Company receives a higher and better bid consistent with the Bid Procedures, so long as this Agreement is not terminated prior to the Closing due to the Purchaser's uncured breach and regardless of whether or not Purchaser makes any matching or competing bids, the Company shall pay to Purchaser a stalking-horse bidder fee in an amount equal to $500,000 (the "**Break Up Fee**") on the date of consummation of any Alternative Transaction.

(b)    The parties intend that the Break Up Fee shall be treated as a superpriority administrative expense in the Bankruptcy Case senior to all unsecured claims and other administrative expenses; provided that, in no event will the Break Up Fee be paid in the absence of the entry of a sale order approving an Alternative Transaction. The Company acknowledges and agrees that: (i) the approval of the Break Up Fee is an integral part of the transactions contemplated by this Agreement and the Stock Subscription Agreements; (ii) in the absence of the Company's obligation to pay the Break Up Fee, Purchaser would not have entered into this Agreement and would not have entered into the Stock Subscription Agreements; (iii) the entry of Purchaser into this Agreement and the Stock Subscription Agreements are necessary for preservation of the estate of the Company and the Bank and is beneficial to the Company because, in the Company's business judgment, it will enhance the Company's ability to maximize the value of its assets for the benefit of its creditors; (iv) the Break Up Fee is reasonable in relation to Purchaser's costs and efforts and to the magnitude of the Contemplated Transactions and Purchaser's

lost opportunities resulting from the time spent pursuing the Contemplated Transactions; and (v) time is of the essence with respect to the entry of the Bidding Procedures Order by the Bankruptcy Court, approving, among other things, the process by which bids may be solicited in connection with the Merger. The Company's agreement to pay the Break Up Fee is subject to Bankruptcy Court entry of the Bidding Procedures Order.

(c)     Notwithstanding anything to the contrary in this Agreement, the Company's obligations under this Section 5.4 shall survive the termination of this Agreement.

5.5     Debtor in Possession.  During the pendency of the Bankruptcy Case, the Company shall continue to operate its business as a debtor in possession pursuant to the Bankruptcy Code.

5.6     Bankruptcy Pleadings.     (a)     On or within one (1) Business Day following the Petition Date, the Company shall file a Bid Procedures Motion (the "**Bid Procedures Motion**") and a sale motion with the Bankruptcy Court (the "**Sale Motion**"), and such additional pleadings as may be necessary to support the Bid Procedures Motion and the Sale Motion, requesting, among other things, approval of the Bid Procedures and entry of the Bidding Procedures Order no later than ten (10) days following the Petition Date.

(b)     No less than 24 hours prior to filing the Bid Procedures Motion and Sale Motion, the Company shall provide such drafts of such motions to Purchaser and its legal counsel, and shall consider in good faith all comments provided by Purchaser or its legal counsel to such motions.

5.7     The Bidding Procedures and Sale Order.

(a)     The Bidding Procedures Order, including the Bid Procedures and the Sale Order, each shall not be amended, modified or supplemented from the forms attached hereto without Purchaser's prior written consent, which may be withheld in Purchaser's sole discretion.

(b)     Purchaser has standing and is deemed to be a party in interest with standing to be heard on any motion, hearing or other matter related to this Agreement or any Qualified Bid (as defined in the Bid Procedures), or other sale of the Shares.

(c)     These Bid Procedures may be modified by the Company as required by the terms of the Bidding Procedures Order.

5.8     Bankruptcy Efforts.  Purchaser and the Company shall use their commercially reasonable efforts to cause the Bankruptcy Court to enter (a) the Bidding Procedures Order within ten (10) days following the Petition Date and (b) the Sale Order within thirty (30) days thereafter.

5.9     Public Announcements  Other than mutually agreed upon press releases and other materials to be issued upon the announcement of this Agreement or thereafter, with respect to which the parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the parties, from and after the date hereof, neither party shall make any public announcement or public comment regarding this Agreement or the Contemplated Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), unless and only to the extent that (a) the furnishing or use of information is required in making any filing or obtaining any Governmental Authorization required for the consummation of the Contemplated Transactions (including any Bank Required Approval), or (b) the furnishing or use of such information is required by Laws.

5.10    Tax Elections.

(a)    On its consolidated federal income Tax Return for the taxable year in which the Closing Date occurs, the Company shall elect under Treasury Regulations Section 1.1502-36(d) to reduce its tax basis in the Shares to the extent necessary to prevent any reduction of the Bank's Tax attributes. All Tax Returns filed by the Company, the Bank and its Subsidiaries shall be consistent with this provision. In addition, the Company shall take any other action reasonably requested by the Bank to preserve the Bank's Tax attributes.

(b)    At Purchaser's discretion, the Company will make, or forego making (and cause its Subsidiaries to make or forego making), the election under Internal Revenue Code Section 108(b)(5) for the consolidated federal return filing year that includes the date of Closing. Purchaser will provide direction to the Company on making or not making the election within twenty (20) days of receiving a preliminary calculation of how the Company would apply the provisions of Sec. 108 to any excluded cancellation of debt income.

(c)    If the Bank currently has in place a valid election under Treasury Regulations Section 1.166-2(d)(3) (the "**Conformity Election**"), at Purchaser's discretion, it will apply for voluntary revocation of the Conformity Election, effective for the Company's consolidated federal return filing year that included the date of Closing. Purchaser will advise the Company in writing of its desire for voluntary revocation within sixty (60) days of the end of the Company's consolidated federal return filing year that included the date of Closing.

(d)    The Company will not make an election under Code §336(e) or Code §338(h)(10) with respect to its sale of the Shares.

5.11    Preparation and Filing of Tax Returns; Taxes. The Company shall include the income (including any deferred items triggered into income by Treas. Reg. §1.1502-13 and any excess loss account taken into income under Treas. Reg. §1.1502-19), equity or other applicable tax base of the Bank and its Subsidiaries on the Company's consolidated, unitary, affiliated or other combined federal and state income Tax Returns for all periods through the end of the Closing Date (such period, the "**Pre-Closing Tax Period**" and such Tax Returns, the "**Company Tax Returns**"), in accordance with applicable tax statutes, and pay any federal and state Taxes attributable to such income, equity or other applicable tax base subject to the Bank reimbursing the Company for the Bank's pro rata share of any such income Taxes paid by the Company, such pro rata share to be determined in accordance with federal consolidated return regulations, where applicable, and with the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure. The Surviving Corporation shall furnish Tax information to the Company for inclusion in such Company Tax Returns in accordance with the Bank's past custom and practice. The income of the Bank and its Subsidiaries shall be apportioned to the period up to and including the Closing Date and the period after the Closing Date by closing the books of the Bank and its Subsidiaries as of the end of the Closing Date. The Company shall timely prepare and file (or cause to be prepared and filed) the Company Tax Returns, and shall prepare all Company Tax Returns in a manner consistent with prior practice in respect of the Bank and its Subsidiaries unless otherwise required by applicable Law or unless the Bank consents to such different treatment, such consent not to be unreasonably withheld, conditioned or delayed. The Company shall provide (or cause to be provided) to the Surviving Corporation a copy of any Company Tax Return at least twenty (20) Business Days prior to the due date for filing such return (or, if such Tax Return is required to be filed within twenty (20) Business Days after the Closing Date, as soon as practicable after preparation but prior to filing thereof), and the Surviving Corporation shall have ten (10) Business Days in which to review and comment on such return prior to the filing thereof. The Company shall not unreasonably withhold its consent to reflect the Surviving Corporation's comments on such returns to the extent permitted by applicable Law. The

Bank and the Company agree to report all transactions not in the ordinary course of business occurring on the Closing Date after the Closing on Surviving Corporation's federal and state income Tax Returns to the extent permitted by Treasury Regulations Section 1.1502-76(b)(1)(ii)(B). Neither the Company nor the Bank shall amend or cause to be amended any consolidated/unitary Tax Returns that relates to any Tax period or portion thereof that ends on or before the Closing Date without the consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed.

5.12    Tax Cooperation. In connection with the preparation of Tax Returns, audit examinations, and any administrative or judicial proceedings relating to the Tax liabilities imposed on or attributable to the Bank or its Subsidiaries, the Bank (and the Surviving Corporation after the Merger) on the one hand and the Company on the other hand shall reasonably cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful for the preparation of such Tax Returns, the conduct of audit examinations or the defense of claims by taxing authorities as to the imposition of Taxes. The Company shall provide to the Bank copies of all information, returns, books, records and documents relating to any Tax Matters of or attributable to the Bank or its Subsidiaries.

5.13    Tax Proceedings. The Company shall promptly notify the Bank upon receipt by the Company of any notice of any inquiries, assessments, audits, proceedings or similar events received from any taxing authority with respect to any Taxes, Tax attributes (including net operating losses) or Tax Refunds of or attributable to the Bank and its Subsidiaries, including such items included in any consolidated, affiliated, unitary or other combined Tax Return, whether attributable to the Pre-Closing Tax Period or any period or portion of a period after the Closing Date (any such inquiry, assessment, audit, proceeding or similar event, a "**Tax Matter**"). The Bank shall have the right to control the process, disposition and decision of whether to settle any Tax Matter in its sole discretion. In addition, the Company shall not enter into any settlement of or otherwise compromise any inquiry, assessment, audit, proceeding or similar event to the extent that such settlement or compromise could adversely affect the Tax liability (including a reduction of a Tax Refund, net operating loss or other Tax attribute) of the Bank or its Subsidiaries, including under this Agreement, without the consent of the Bank, such consent not to be unreasonably withheld, conditioned or delayed.

5.14    Transfer of Business-Related Assets and Contracts. If at any time, whether before or after the Closing, the Company or any of its officers or employees discovers or is otherwise aware of the fact that the Company or one of its Subsidiaries (other than the Bank or its Subsidiaries) (a) owns any asset (whether real, personal, tangible, intangible or otherwise) that is used or held for use in connection with, or that relates to, the business of the Bank or its Subsidiaries or (b) is a party to any Contract relating to the business of the Bank or its Subsidiaries ((a) and (b), collectively, the "**Business-Related Assets and Contracts**"), the Company will promptly give notice of that fact to the Purchaser and, if the Purchaser so requests, the Company will use its best efforts to promptly cause such asset to be transferred to the Bank (or the Surviving Corporation after the Merger) free and clear of all Encumbrances, or the rights and obligations (but not any obligations relating to a pre-transfer breach or default) under such Contract to be assigned to the Bank (or the Surviving Corporation after the Merger) free and clear of all Encumbrances, as the case may be, for no additional consideration beyond that currently provided for herein.

5.15    Plan. The Company covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by the Company for confirmation, or proposed order dismissing the Bankruptcy Case, shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated

by this Agreement, including any transaction that is approved pursuant to the Sale Order. The terms of this Section 5.15 shall be included in the Sale Motion and the Sale Order.

5.16    Appeal. If the Sale Order or the Bidding Procedures Order is appealed by any Person, or petition for certiorari or motion for rehearing or reconsideration is filed with respect thereto, if requested by Purchaser, the Company will take all action as may be reasonably necessary to defend against such appeal, petition or motion and to obtain an expedited resolution of such appeal, petition or motion, and, in such case, Purchaser will take all actions as may be reasonably requested by the Company to assist the Company in such defense.

5.17    Non-Solicitation of Competing Bids. Except in accordance with the Bidding Procedures Order (once entered by the Bankruptcy Court), the Company shall not, and shall cause its Affiliates and its and their representatives not to, (a) solicit or negotiate with any Specified Person (and to cease immediately any such ongoing activity), or enter into any agreement or understanding with respect to, or approve or recommend, any direct or indirect sale of any equity interest in, or any material portion of the assets of, the Company or the Bank or any extraordinary corporate transaction directly or indirectly involving the Company or the Bank or (b) provide any Specified Person (other than Purchaser and each of their Affiliates, agents and representatives) with access to the books, records, operating data, contracts, documents or other information relating to the Bank. The Company shall promptly notify Purchaser of any proposal or offer from a third party to acquire, directly or indirectly, all or any substantial portion of the assets, properties, rights and interests of the Company or the Bank received by the Company in writing after the date hereof, and the Company shall communicate to the Purchaser the material terms of any such bid.

## ARTICLE 6

## CONDITIONS OF CLOSING

6.1    Conditions to Purchaser's Obligations. The obligation of Purchaser to complete the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions:

(a)    Representations and Warranties. The representations and warranties of the Company contained in this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) as of the date of this Agreement on and as of the Closing, as though made on and as of such date, except for representations or warranties that speak as of a specified earlier date;

(b)    Covenants. The covenants and obligations of the Company to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c)    Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order and such order (i) shall have become Final and Non-appealable, (ii) shall not have been stayed, stayed pending appeal or vacated, and (iii) shall not have been amended, supplemented or otherwise modified, except with the prior written consent of Purchaser, which consent shall not be unreasonably withheld;

29

(d)　　Sale Order. The Bankruptcy Court shall have entered the Sale Order and such order (i) shall have become Final and Non-appealable, (ii) shall not have been stayed as of the Closing Date, stayed pending appeal or vacated, and (iii) shall not have been amended, supplemented or otherwise modified, except with the prior written consent of Purchaser, which may be withheld in Purchaser's sole discretion;

(e)　　Shareholder Approval. This Agreement and an amendment to the Purchaser's articles of incorporation to authorize the Purchaser Stock shall have been approved by the requisite vote of Purchaser's shareholders in accordance with applicable laws and regulations (the "**Shareholder Approval**");

(f)　　Officers' Certificate. The Company shall have delivered to Purchaser an Officers' Certificate from the chief executive officer and the chief financial officer certifying to the effect that the conditions set forth in Section 6.1(a) and (b) have been satisfied;

(g)　　Consents. The material consents necessary for the continued operations of the business of the Bank or its Subsidiaries, which are set forth in Section 6.1(g) of the Disclosure Schedule, shall have been obtained in form and substance reasonably acceptable to Purchaser and shall be in effect;

(h)　　No Litigation. There shall not be pending or threatened against Purchaser or Bank any Action by any Governmental Authority or other Persons that, in the reasonable opinion of Purchaser, (i) would impose a Burdensome Condition, (ii) prevent the Closing, or (iii) in which there is a possibility of an outcome that could have a Material Adverse Effect;

(i)　　No Material Adverse Effect. From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect;

(j)　　Tax Opinion. Purchaser shall have received a limited scope tax opinion (the "**Tax Opinion**") from a big four accounting firm;

(k)　　Required Approvals. The Bank Required Approvals shall have been received in form and substance reasonably acceptable to Purchaser and without the imposition of any Burdensome Condition, and no such Bank Required Approval shall have been amended, modified, reversed or vacated;

(l)　　Escrowed Proceeds. The gross proceeds to Purchaser from the Stock Offering shall be not less than $20 million, with such subscription funds having been previously placed in escrow and subject to release from escrow to the Purchaser contingent only upon the Closing;

(m)　　Stock Subscription Agreements. All conditions to the closing of the transactions under the Stock Subscription Agreements shall have been satisfied (other than the simultaneous consummation of the transactions contemplated under such agreements), and the Purchaser shall consummate the closing of the transactions under the Stock Subscription Agreements simultaneously with the consummation of the Sale;

(n)　　Business-Related Assets and Contracts. The Company shall have transferred to the Bank all Business-Related Assets and Contracts of which the Company is aware as of the Closing Date, free and clear of Encumbrances;

(o)     Consent Order. The Consent Order shall terminate at or before the Effective Time; and

(p)     Fairness Opinion. The opinion received by Purchaser from Hovde Group, LLC with respect to the Merger shall not have been amended or rescinded.

The foregoing conditions are for the benefit of Purchaser only, and accordingly, Purchaser will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination in the event of non-performance of any other conditions in whole or in part.

6.2     Conditions to the Company's Obligations. The obligation of the Company to complete the transactions contemplated by this Agreement is subject to the fulfillment of each of the following conditions:

(a)     Representations and Warranties. The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) as of the date of this Agreement on and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date);

(b)     Covenants. The covenants and obligations of Purchaser to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c)     Sale Order. The Bankruptcy Court shall have entered the Sale Order; and

(d)     Secretary's Certificate. Purchaser shall have delivered to the Company a Secretary's Certificate certifying to the effect that the conditions set forth in Section 6.2(a) and (b) have been satisfied.

The foregoing conditions are for the benefit of the Company only and accordingly the Company will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination in the event of non-performance of any other conditions in whole or in part.

6.3     Mutual Condition. The obligations of the Company and Purchaser to complete the Contemplated Transactions are subject to the fulfillment of the condition that no injunction or restraining order or other decision, ruling or order of a court, board, Governmental Authority or administrative tribunal of competent jurisdiction being in effect which prohibits, restrains, limits or imposes conditions on the transactions contemplated by this Agreement and no action or proceeding having been instituted or remaining pending or having been threatened (and such threat not having been withdrawn) before any such court, board, Governmental Authority or administrative tribunal to restrain, prohibit, limit or impose conditions on the transactions contemplated by this Agreement.

6.4     Termination.

(a)     In the event that the Closing has not occurred on or before the Outside Date, Purchaser or the Company, as applicable, may, subject to Section 9.10, terminate this Agreement, in which

31

event the parties will be released from all obligations under this Agreement, except that the Company will not be released from its obligations to pay the Break Up Fee on the date of consummation of an Alternative Transaction unless Purchaser is in material breach of this Agreement, and provided that no party will be released from its obligations, or may terminate this Agreement if it has willfully and materially breached (and not cured) any of its covenants or obligations in or under this Agreement and such breach has been the cause of or resulted in the failure of the Closing to occur on or before the Outside Date.

      (b)     This Agreement may also be terminated prior to the Closing:

          (i)     at any time by the mutual written agreement of the Company and Purchaser;

          (ii)     by Purchaser (provided, that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in Section 6.1(a) or (b) have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within thirty (30) days after written notice by Purchaser to the Company;

          (iii)     by the Company (provided, that the Company is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in Section 6.2(a) or (b) have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within thirty (30) days after written notice by the Company to Purchaser;

          (iv)     by the Company or Purchaser, if the Bankruptcy Court enters a Sale Order approving the Sale to a Qualified Overbidder (as defined in the Bidding Procedures Order), other than Purchaser;

          (v)     by either the Company or Purchaser, with fifteen (15) days' prior written notice or such shorter period as required by a court or Governmental Authority, or any applicable Law, if any court or Governmental Authority shall finally determine that the subject of this Agreement violates any applicable Law and the terms of this Agreement cannot be amended to meet all legal requirements to the satisfaction of such court or Governmental Authority;

          (vi)     by either the Company or Purchaser, if Purchaser or any of its Affiliates receives written notice from or is otherwise advised by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any Bank Required Approvals or receives written notice from or is otherwise advised by such Governmental Authority that it will not grant any such Bank Required Approvals on the terms contemplated by this Agreement without imposing any Burdensome Condition;

          (vii)     by Purchaser, if the Bankruptcy Court has not entered the Bidding Procedures Order within twenty (20) days of the Petition Date or if the Bidding Procedures Order has been entered but is stayed or has been reversed or vacated on or after such date, or if the Bidding Procedures Order has been entered but has been amended or modified other than in accordance with this Agreement on or before such date;

          (viii)     by Purchaser, if the Bankruptcy Court has not entered the Sale Order approving the Sale to Purchaser by forty-five (45) days after entry of the Bidding Procedures Order, if such Sale Order has been entered but is stayed or has been reversed or vacated on or after such date, or if the

Sale Order has been entered but has been amended or modified other than in accordance with this Agreement on or before such date;

            (ix)      by Purchaser, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; and

            (x)      by Purchaser, if the Bankruptcy Court approves any Alternative Transaction or any Alternative Transaction is consummated by the Company or the Bank.

      6.5      <u>Investigations</u>.    No investigation by either of the parties or their respective representatives shall affect or be deemed to modify or waive the representations and warranties of the other set forth herein.

**ARTICLE 7**

**CLOSING TRANSACTIONS**

      7.1      <u>Time and Place</u>. The Closing shall take place in the offices of Nelson Mullins Riley & Scarborough LLP at 201 17th Street NW, Atlanta, Georgia 30363 on the Closing Date; or at such other time and date, or both, as the Company and the Purchaser or their respective counsel may agree upon in writing.

      7.2      <u>Company's Closing Deliverables</u>. At the Closing, the Company shall deliver the following to Purchaser or the Bank, as applicable:

            (a)      a certificate signed by the chief executive officer and chief financial officer of the Company, certifying to the fulfillment of the conditions specified in <u>Section 6.1(a)</u> and <u>(b)</u>;

            (b)      a stock certificate evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank and with all required stock transfer Tax stamps affixed for cancellation by the Bank;

            (c)      all conveyances, transfers, assignments, instruments and other documents which are necessary to consummate the Merger and the transfer of the Business-Related Assets and Contracts to the Purchaser as contemplated by this Agreement in such form and content as the Purchaser may require, acting reasonably;

            (d)      certified copies of a resolution of the directors of the Company and of the Company as sole shareholder of the Bank approving the completion of the Contemplated Transactions including, without limitation, the Merger and transfer of the Business-Related Assets and Contracts to the Purchaser and the execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement in such form and content as the Purchaser may require, acting reasonably;

            (e)      a certified copy of the Sale Order;

            (f)      a letter agreement, in form and substance reasonably satisfactory to Purchaser, the terms of which are included in the Sale Motion and the Sale Order, pursuant to which the Company, on its own behalf and on behalf of its Affiliates, irrevocably and unconditionally waives, releases and discharges any and all claims, counterclaims, demands, debts, costs, expenses, Liabilities, damages, obligations and causes of action of any kind or nature whatsoever, in each case whether absolute or contingent, liquidate or

unliquidated, known or unknown, and whether arising under any agreement or understanding or otherwise in law or in equity, against the Bank and its Subsidiaries (and their successors and its and their respective officers, directors, employees, managers, partners, shareholders members, and principals) other than Liabilities under this Agreement; and

(g)    an affidavit from the Company that it is not a "foreign person" or subject to withholding requirements under the Foreign Investment in Real Property Tax Act of 1980, as amended.

7.3    <u>Purchaser's Closing Deliverables</u>. At the Closing, Purchaser shall deliver the following:

(a)    to the Company, a certificate signed by an authorized signor of Purchaser, certifying to the fulfillment of the conditions specified in <u>Section 6.2(a)</u> and <u>(b)</u>; and

(b)    to the Company, the Merger Consideration.

7.4    <u>Bank's Closing Deliverables</u>.

(a)    The Bank shall have delivered a letter agreement to the Company, in form and substance reasonably satisfactory to the Company, pursuant to which the Bank, on its own behalf and on behalf of its Affiliates, irrevocably and unconditionally waives, releases and discharges any and all claims, counterclaims, demands, debts, costs, expenses, Liabilities, damages, obligations and causes of action of any kind or nature whatsoever, in each case whether absolute or contingent, liquidate or unliquidated, known or unknown, and whether arising under any agreement or understanding or otherwise in law or in equity, against the Company and its Affiliates (other than the Bank and the its Subsidiaries (and their successors and its and their respective officers, directors, employees, managers, partners, shareholders members, and principals)) other than Liabilities under this Agreement.

## ARTICLE 8

## TERMINATION OF REPRESENTATIONS AND COVENANTS

8.1    <u>Termination</u>. The Company and Purchaser agree that all of the representations, warranties, agreements and covenants of the Company and the Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate as of the Effective Time and shall thereafter be of no force or effect except for those agreements and covenants contained in this Agreement that by their terms are required to be performed after the Effective Time (including, but not limited to, Sections 5.10, 5.11, 5.12, 5.13, 5.14, 5.15, and Article 9) shall survive the Effective Time until they have been performed or satisfied.

## ARTICLE 9

## MISCELLANEOUS

9.1    <u>Legal and Other Fees and Expenses</u>. Unless otherwise specifically provided herein or in any other agreement with respect to the Contemplated Transactions, the parties will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement, the completion of the Contemplated Transactions and other matters pertaining hereto.

9.2     <u>Notices</u>. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile or e-mail (provided the sender receives a machine-generated confirmation of successful facsimile transmission or e-mail notification or confirmation of receipt of an e-mail transmission) at the facsimile number or e-mail address specified in this <u>Section 9.2</u> prior to 5:00 p.m., Eastern time, on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile or e-mail at the facsimile number or e-mail address specified in this <u>Section 9.2</u> on a day that is not a Business Day or later than 5:00 p.m., Eastern time, on any Business Day, (c) if sent by U.S. nationally recognized overnight courier service with next day delivery specified (receipt requested) the Business Day following delivery to such courier service, or (d) upon actual receipt by the party to whom such notice is required to be given.  The address for such notices and communications shall be as follows:

| | |
|---|---|
| If to the Bank: | FIRST CITY BANK OF FLORIDA |
| | 135 Perry Avenue, SE |
| | Fort Walton Beach, FL 32548 |
| | Attention: Bob Bennett, President and COO |
| | Telephone: (850) 244-5151 |
| | Facsimile: |
| | Email: bbenett@firstcitybank.com |
| With a copies to: | GERRISH SMITH TUCK |
| | 700 Colonial Road, Suite 200 |
| | Memphis, TN 38117 |
| | Attention: Greyson E. Tuck |
| | Telephone: (901) 684-2311 |
| | Facsimile: (901) 684-2339 |
| | Email: gtuck@gerrish.com |
| | and |
| | WHF ATTORNEYS AT LAW |
| | 307 S. Palafox Street |
| | Pensacola, FL 32502 |
| | Attention: J. Steven Ford |
| | Telephone: (850) 438-1111 |
| | Facsimile: |
| | Email: jsf@whsbf-law.com |
| If to Purchaser: | BEACH COMMUNITY BANK |
| | 17 S.E. Elgin Parkway |
| | Fort Walton Beach, FL 32548 |
| | Attention: Chief Executive Officer |
| | Telephone: (850) 244-9900 |
| | Facsimile: (850) 244-9901 |
| | Email: chip@beachcommunitybank.com |
| With a copy to: | Nelson Mullins Riley & Scarborough, LLP |
| | One Post Office Square |
| | 30th Floor |
| | Boston, MA 02109 |
| | Attn: Peter J. Haley |
| | Telephone: 617.217.4714 |
| | Email: peter.haley@nelsonmullins.com |

or such other address as may be designated in writing hereafter, in the same manner, by such Person.

9.3     Further Assurances.    Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of

36

this Agreement, give effect to the transactions contemplated by this Agreement and assure to the Purchaser good and valid title to the Shares, free and clear of all Encumbrances. The Company shall seek to enforce its rights under any third party nondisclosure or confidentiality agreements on behalf of and at the request and expense of the Purchaser.

9.4     Time of the Essence. Time shall be of the essence of this Agreement.

9.5     Entire Agreement. This Agreement (and all related documents referred to herein, including the schedules and exhibits hereto) constitutes the entire agreement between the Company and the Purchaser pertaining to the Contemplated Transactions and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Company and the Purchaser and there are no warranties, representations, covenants, obligations or agreements between the Company (or any Affiliate thereof) and the Purchaser (or any Affiliate thereof) except as set forth in this Agreement (or any such related document).

9.6     Assignment. Neither party to this Agreement may assign any of its respective benefits, obligations or liabilities under or in respect of this Agreement without the prior written consent of the other party, which may be withheld in its absolute discretion; provided, however, that the Purchaser may, without the consent of the Company, assign its rights and benefits under or in respect of this Agreement, in whole or in part, to one or more directly or indirectly wholly-owned Subsidiaries, if and to the extent permitted by the regulatory approvals required to be obtained in connection with the Contemplated Transactions and the Bankruptcy Court, but no such assignment will relieve the Purchaser of its obligations under this Agreement. Any attempted assignment without the necessary consent shall be void.

9.7     Invalidity. Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

9.8     Waiver and Amendment. Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver. No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement nor a continuing waiver unless otherwise expressly provided.

9.9     Third-Party Beneficiaries; Bank as Party. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than, (i) solely with respect to the provisions in Section 5.19, the covered directors and officers under the tail coverage; and (ii) the parties hereto and such permitted assigns, any legal or equitable rights hereunder. The Bank is a party to this Agreement solely for purposes of Sections 5.10, 5.11, 5.12, 5.13, 5.18, 7.4, and 9.9; provided, however, that nothing in this Agreement shall in any way limit the Bank's right to claim any benefits inuring to it under any other sections of this Agreement.

9.10     Surviving Provisions on Termination. Notwithstanding any other provisions of this Agreement, if this Agreement is terminated, the provisions of Sections 1.3, 5.4, 6.4(a) and 9.1 shall survive such termination and remain in full force and effect, and each party shall remain liable for any willful breach of this Agreement prior to its termination.

9.11    Captions. The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

9.12    Counterparts. This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

9.13    Delivery by Facsimile. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments or waivers hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by e-mail delivery of a ".pdf" format data file, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or e-mail delivery of a ".pdf" format data file to deliver a signature to this Agreement or any amendment hereto or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or e-mail delivery of a ".pdf" format data file as a defense to the formation of a contract and each party hereto forever waives any such defense.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

COMPANY:

FLORIDA CITY BANKS, INC.

By: _____
　　Name: John C. McGee
　　Title: Chairman and Chief Executive Officer

BANK:

FIRST CITY BANK OF FLORIDA

By: _____
　　Name: John C. McGee
　　Title: Chairman and Chief Executive Officer

PURCHASER:

BEACH COMMUNITY BANK

By: _____
　　Name: Charles N. Reeves
　　Title: President and Chief Executive Officer

**IN WITNESS WHEREOF** the parties have executed this Agreement as of the day and year first above written.

COMPANY:

**FLORIDA CITY BANKS, INC.**

By: _____
        Name: John C. McGee
        Title: Chairman and Chief Executive Officer

BANK:

**FIRST CITY BANK OF FLORIDA**

By: _____
        Name: John C. McGee
        Title: Chairman and Chief Executive Officer

PURCHASER:

**BEACH COMMUNITY BANK**

By: _____
        Name: Charles N. Reeves
        Title: President and Chief Executive Officer

Florida First City Banks, Inc.
First City Bank of Florida
Fort Walton Beach, Florida

Disclosure Schedules

Disclosure Schedules have been omitted for confidentiality purposes.

**Exhibit A**
**Bidding Procedures Order**

*See attached.*

**Exhibit B**
**Sale Order**

*See attached.*

**Exhibit C**
**Plan of Merger Statutory Information**

*To be provided supplementally.*